No. 21-3251

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

UNITED STATES OF AMERICA
                                    Appellant

v.

DONTE DOWDELL

Appeal from an Order Suppressing Evidence in a Criminal Case in the United States District Court for the District of New Jersey (No. 21-cr-363). Sat Below: Hon. John Michael Vazquez, U.S.D.J.

———————————————————————————————

APPENDIX VOLUME I
(Pages A1–A46)

———————————————————————————————

Philip R. Sellinger
United States Attorney
Attorney for Appellant
970 Broad Street
Newark, New Jersey 07102-2535
(973) 645-2700

On the Appendix:

Mark E. Coyne
Assistant U.S. Attorney
Chief, Appeals Division
(973) 297-2002

# TABLE OF CONTENTS

**Page**

**Volume I**

Notice of Appeal...........................................................................A1

Certification of Acting United States Attorney ...........................A2

Order Granting Suppression Motion...........................................A3

Transcript of Oral Opinion Granting Motion to Suppress ...........A5

**Volume II**

Motion to Suppress .....................................................................A47

Letter Brief in Opposition to Motion to Suppress.......................A60

Reply in Support of Motion to Suppress.....................................A72

Transcript of Suppression Hearing..............................................A78

Supplemental Brief in Support of Motion to Suppress ...............A231

Supplemental Brief in Opposition to Motion to Suppress ..........A243

Supplemental Reply Brief in Support of Motion to Suppress .....A268

Complaint and Warrant, *State v. Dowdell*, No. 1808-W-2021-000013.........A276

Complaint and Warrant, *State v. Dowdell*, No. 1808-W-2021-000014.........A282

Dismissal Notice, *State v. Dowdell*, No. 1808-W-2021-000013 ...................A288

Dismissal Notice, *State v. Dowdell*, No. 1808-W-2021-000014 ...................A289

Docket, *United States v. Dowdell*, No. 21-cr-363 (JMV) (D.N.J.).................A290

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Hon. John Michael Vazquez, U.S.D.J. |
| Appellant | : | |
| v. | : | Crim. No. 21-363 (JMV) |
| | : | |
| DONTE DOWDELL, | : | **Notice of Appeal** |
| Appellee. | : | |

Notice is hereby given that, pursuant to 18 U.S.C. § 3731, the United States

of America hereby appeals to the United States Court of Appeals for the Third

Circuit from the District Court's Order entered December 2, 2021 [Docket Entry

37] suppressing evidence, as explained in the District Court's bench opinion.

Respectfully submitted,

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY

By:   Mark E. Coyne
Assistant U.S. Attorney
Chief, Appeals Division

December 3, 2021
Newark, New Jersey

**A1**

## ACTING UNITED STATES ATTORNEY'S CERTIFICATION

I certify that this appeal is not taken for the purpose of delay and that the suppressed evidence is a substantial proof of a fact material in the proceeding.

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY

December 3, 2021
Newark, New Jersey

## CERTIFICATION OF SERVICE

I hereby certify that on December 3, 2021, I caused a copy of the attached Notice of Appeal to be served electronically, using the Court's ECF System, by Notice of Electronic Filing on the following Filing User:

AFPD Rahul Sharma
rahul_sharma@fd.org

Mark E. Coyne
Assistant U.S. Attorney
Chief, Appeals Division

Dated: December 3, 2021

A3

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

     *Plaintiff*,

    v.

DONTE DOWDELL,

     *Defendant*.

Crim. No. 21-363

**ORDER**

**John Michael Vazquez, U.S.D.J.**

Currently pending before the Court is Defendant's motion to suppress D.E. 17. The Government filed opposition, D.E. 18, to which Defendant replied, D.E. 19. The Court then held an evidentiary hearing, D.E. 31, and permitted supplemental briefing. Defendant submitted a supplemental brief, D.E. 30; the Government filed supplemental opposition, D.E. 33, and the Defendant filed a supplemental reply, D.E. 34. The Court then issued a verbal opinion on the record on December 2, 2021. Among other things, the Court disagreed with the Government that the detective had a reasonable articulable suspicion based on the totality of the circumstances to justify the opening of the rear door of the vehicle. As a result, the detective's subsequent observations (of a bulge in Defendant's jacket) were not in plain view and the subsequent pat down (revealing a handgun) was not warranted. As a result, and for good cause shown,

**IT IS** on this 2nd day of December 2021 hereby

**ORDERED** that that Defendant's motion to suppress, D.E. 17, is GRANTED.

       s/ John Michael Vazquez
       John Michael Vazquez, U.S.D.J.

1
2

**UNITED STATES DISTRICT COURT.**
**FOR THE DISTRICT OF NEW JERSEY**

3   UNITED STATES OF AMERICA,          CRIMINAL NUMBER:

4           vs.                        2:21-cr-363-JMV

5   DONTE DOWDELL,                     Opinion Read

6           Defendant.

7           Frank R. Lautenberg Post Office and U.S. Courthouse
            Two Federal Square
8           Newark, New Jersey  07101
            December 2, 2021
9

10  **B E F O R E:**              THE HONORABLE JOHN MICHAEL VAZQUEZ,
                                  UNITED STATES DISTRICT COURT JUDGE
11

12              **  ALL PARTIES PRESENT VIA ZOOM  **

13  A P P E A R A N C E S:

14      OFFICE OF THE UNITED STATES ATTORNEY, BY:
        KENDALL RENEE RANDOLPH, ASST. UNITED STATES ATTORNEY
15      ROBERT L. FRAZER, ASST. UNITED STATES ATTORNEY
        970 Broad Street
16      Newark, New Jersey  07102

17          appeared on behalf of the Government;

18      OFFICE OF THE FEDERAL PUBLIC DEFENDER, BY:
        RAHUL KUMAR SHARMA, ASST. FEDERAL PUBLIC DEFENDER
19      K. ANTHONY THOMAS, ASST. FEDERAL PUBLIC DEFENDER
        1002 Broad Street
20      Newark, New Jersey  07302

21          appeared on behalf of the Defendant;

22

23

24
                */S/ Lisa A. Larsen, RPR, RMR, CRR, FCRR*
25                   *Lisalarsen25@gmail.com*
                        *(630)338-5069*

1    **A L S O   P R E S E N T:**

2        Donte Dowdell, Defendant.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held via Zoom conference before
 2              The HONORABLE JOHN MICHAEL VAZQUEZ, United States
 3              District Court Judge, on December 2, 2021.)
 4         THE COURT:  We're on the record in the matter of U.S.
 5    vs. Dowdell.  The criminal number is 21-363.
 6         Can I please have appearances.
 7         MS. RANDOLPH:  Good morning, Your Honor, Kendall
 8    Randolph, Assistant United States Attorney, for the
 9    Government.
10         MR. FRAZER:  AUSA Robert Frazer for the Government.
11    Good morning, Your Honor.
12         THE COURT:  Good morning.
13         MR. SHARMA:  Good morning, Your Honor, Rahul Sharma,
14    Assistant Federal Public Defender, on behalf of Mr. Dowdell.
15    With me is Anthony Thomas, also an Assistant Federal Public
16    Defender on behalf of Mr. Dowdell.
17         THE COURT:  Good morning, Counsel.
18         Good morning, Mr. Dowdell.
19         THE DEFENDANT:  Good morning.
20         THE COURT:  We're here for a ruling on the
21    suppression motion filed by Mr. Dowdell.  By way of
22    background, in preparation for today's ruling I did go back
23    and review the initial briefing, the hearing transcript from
24    October 12th of this year, 2021, Mr. Dowdell's supplemental
25    brief after the hearing, the Government's supplemental
```

1   opposition, and then also Mr. Dowdell's supplemental reply.

2        Before I get to the decision, I just want to review

3   with Mr. Dowdell his rights about appearing by way of video.

4   We're using the video option due to the ongoing pandemic and

5   the authority provided in the CARES Act and the related

6   standing orders of our Chief Judge.

7        Can I please have Mr. Dowdell sworn.

8             DONTE DOWDELL, DEFENDANT, DULY SWORN.

9        THE COURT:  Mr. Dowdell, you're now under oath which

10  means you do have to tell the truth.  If you should not tell

11  the truth, you could face a separate prosecution for perjury,

12  obstruction, or giving a false statement.

13       If at any point you'd like to have a private

14  conversation with your counsel, please let me know.  We do

15  have a feature where you can have a confidential conversation

16  with your counsel and then return to the proceeding when

17  you're ready.

18       Do you understand that?

19           THE DEFENDANT:  Yes.

20       THE COURT:  Now, you do have a right to wait and have

21  this matter conducted in open court.

22       Do you understand that?

23           THE DEFENDANT:  Yes.

24       THE COURT:  Would you like to proceed by way of

25  video?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And have you had a chance to discuss the

3   use of video with your counsel?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Mr. Sharma, would you also like to

6   proceed --

7          MR. SHARMA:  Yes, Your Honor.  I'm sorry.

8          THE COURT:  As to the use of video, I do find that

9   Mr. Dowdell has voluntarily consented after having had an

10  opportunity to discuss the matter with his counsel.

11       I find it's in the interest of justice to do so.  It's

12  in Mr. Dowdell's interest to avoid any undue delay in hearing

13  the decision in this matter.

14       I want to give the parties an opportunity if they wish

15  to make any additional argument.  It's not required.  I am

16  prepared to rule, but I think it's only fair that, after I

17  read the papers, if there's any areas the parties would like

18  to address.

19       I'll give Mr. Sharma the first opportunity.

20          MR. SHARMA:  No, Your Honor.  I believe that the -- I

21  believe we have addressed everything in our written and oral

22  submissions to the Court.

23          THE COURT:  Okay.  Thank you.

24       Ms. Randolph.

25          MS. RANDOLPH:  Likewise the Government will rely on

1   its papers and the hearing transcript.  Thank you, Your Honor.

2        THE COURT:  Just so I'm clear on one point, I

3   understand the dispute over the legitimacy of the stop, and

4   that really comes down to whether or not a blinker was used on

5   making the right turn, but then in the defense's supplemental

6   brief they also argued -- they made two other arguments.

7        One dealt with the pat down due to the bulge in the

8   jacket, and before that they also argued that Detective

9   Gambino improperly opened the door -- the back door and that's

10  when he saw the bulge in Mr. Dowdell's jacket.

11       My understanding is that the Government's position is

12  that not only -- that the opening of the door was appropriate

13  and that's based on an argument pursuant to *the Terry* standard

14  that Detective Gambino had a reasonable articulable suspicion

15  in light of the totality of the circumstances.

16       Correct?

17        MS. RANDOLPH:  That's absolutely correct, Your Honor,

18  yes.

19        THE COURT:  Please bear with me because first I'm

20  going to review the testimony and then I'll go through the

21  analysis.  I want to make sure that we have a full record

22  here.

23       As to the testimony that was heard, first, Detective

24  Nicholas Gambino testified.  He is with the Somerset County

25  Prosecutor's Office.  He has been with them for about a

1   year and a half.

2        Previously he worked for seven years with the Franklin

3   Township Police Department.  He is a member of the Organized

4   Crime and Narcotics Task Force.  That task force is a

5   proactive unit focused on gang violence, robbery, stolen

6   vehicles, and narcotics.

7        There was some background elicited first as to the area

8   in Somerset and Franklin Township, and Detective Gambino

9   testified that there was a particular area of concern, that is

10  the Parkside Housing Complex which was bordered by Hamilton

11  Street, Franklin Boulevard, and Somerset Street.

12       He also mentioned the Naaman Williams Park and

13  specifically indicated that there was a particular gazebo in

14  the park which was a common meeting place for the Bounty

15  Hunter Bloods, and he went on to explain that the gang

16  activity or the gangs in that particular area were the Bounty

17  Hunter Bloods and the Parkside Kings.

18       Detective Gambino indicated that Mr. Dowdell is a known

19  gang member and that since the summer of 2020 his unit has

20  been dealing with increased gang violence, including homicides

21  and aggravated assaults, stolen vehicles, and narcotics

22  distribution.

23       He went on to note that around January 3rd of this

24  year, 2021, Mr. Dowdell's house or residence was shot at

25  during a drive-by shooting, and he noted that the residence

1 was on Voorhees Avenue near Route 27 and Franklin Boulevard.

2       As to the critical date, January 8th of 2021, Detective

3 Gambino indicated that he was working in a surveillance unit.

4 His shift was 4:00 p.m. to midnight.  He was in plain clothes

5 and he was driving alone in a black Acura.  However, other

6 members of the task force were also working in either

7 surveillance units or in an unmarked unit with lights and

8 sirens.

9       He saw a white -- the detective saw a white BMW

10 traveling from Fuller Street across Franklin Boulevard.  At

11 the time he did not know who was in the car and it was in the

12 evening and it was dark out.

13       Now, the detective indicated that he had seen the BMW

14 about a half our earlier at 166 Stothoff Street which is the

15 address for Lorenzo Hill.  Lorenzo Hill ultimately was also a

16 passenger in the vehicle, and based on the detective's past

17 experience, gang members would meet at that address before

18 engaging in criminal activity.

19       When the detective later saw the BMW, he began to

20 follow it.  He raised some concern about the route that was

21 taken because in his experience persons engaged in criminal

22 activity would use Fuller Street to avoid main arteries such

23 as Route 27 which have cameras.

24       He followed the BMW on Fuller Street, which turns into

25 Blair Avenue, and then up to Berry Street.  When the BMW got

1    to Berry Street, the detective saw the BMW turn right without

2    using a turn signal.  He was about a half a block behind the

3    BMW at the time and there were no other vehicles in between.

4         He then informed other members of the task force to

5    stop the vehicle.  Detective Sergeant Brown, who also

6    testified, had at the time been driving somewhere behind

7    Detective Gambino and Detective Sergeant Brown conducted the

8    stop.

9         Detective Gambino believed the stop occurred in the

10   area of the corner of Spruce and Berry while the BMW was

11   making a left onto Spruce, which is a dead-end.  The detective

12   also explained that Spruce Street was an area where law

13   enforcement had received complaints about drug distribution

14   and also made an arrest for weapons offenses.

15        After the stop the detective approached the passenger's

16   side.  When he approached, he indicates he did not know who

17   was in the BMW but using a flashlight he saw Mr. Dowdell in

18   the backseat of the car and he was familiar with Mr. Dowdell

19   based on prior interactions.

20        In the front-seat passenger -- I'm sorry, the

21   front-seat passenger was Lorenzo Hill and the driver was

22   Mr. Hill's girlfriend Symeerah Hyman who also testified at the

23   hearing.

24        Detective Gambino said that he opened the back door to

25   speak with Mr. Dowdell because he knew that Mr. Dowdell was

1  the victim of a recent drive-by shooting and wanted to see if

2  Mr. Dowdell had any information on the shooting.

3      Once the detective opened the door, he saw a large

4  bulge in the chest portion of Mr. Dowdell's jacket.  The

5  detective noted it was more pronounced due to the seat belt

6  that Mr. Dowdell was wearing.  The bulge was in the left chest

7  area and looked to be about the size of a handgun.  And the

8  detective noted that Mr. Dowdell was tall and lean.

9      At that point, for officer safety, the detective

10  notified other members of the task force who were present that

11  they needed to get all the other persons out of the car.  The

12  detective asked Mr. Dowdell to exit the vehicle, which

13  Mr. Dowdell did.

14      The detective patted down the area of the bulge and can

15  feel that it was a handgun.  At that point Mr. Dowdell said

16  that it was in his pocket.  Mr. Dowdell was placed under

17  arrest, and then the search incident to arrest did not result

18  in any other illegal material or evidence.

19      The handgun that was recovered was a Ruger P95.  The

20  search of the vehicle, according to the detective, did not

21  reveal anything improper and Miss Hyman and Mr. Hill were

22  released and drove off.

23      Before searching the vehicle, the detective first

24  obtained a consent to search from Miss Hyman, the driver of

25  the vehicle.  Ultimately, Miss Hyman was issued a summons for

1  the motor vehicle infraction by Officer Pelissier who is a

2  task force officer.

3       The detective also noted that Mr. Dowdell is known as

4  "Pooh" and that Lorenzo Hill is known as "Hondo Pac" and

5  indicated that he was not wearing a body camera that night

6  because he was not required to and that the radio

7  transmissions concerning the following and the stop of the

8  BMW were not recorded because the task force was operating

9  on an encrypted channel due to the sensitivity of the

10  investigations.

11       On cross-examination, among other things, there was

12  questions about when the detective first saw the BMW on

13  Stothoff Street.  The detective explained that he drove past

14  it more than once, but he could not recall if he saw people in

15  the BMW at the time.

16       He explained that when he drove by he does not actually

17  think he drove down Stothoff Street.  He believes he drove on

18  streets connected with it, either Millstone Road or Parkside

19  Street, because he usually did not drive down Stothoff Street

20  because it's a narrow street and it usually has a number of

21  cars and people.

22       He admitted that, except for the failure to use the

23  turn signal, he did not see any other motor vehicle

24  infractions involving the BMW.  Then also on cross as to his

25  January 8th affidavit, the detective indicated that he saw a

1  bulge in Mr. Dowdell's front breast pocket but did not say

2  that it was a large bulge or that it resembled the outline of

3  a gun, as he testified to at the hearing.

4       Following the detective, then Detective Sergeant

5  William Brown testified.  He's also currently with the

6  Somerset County Prosecutor's Office.  He has been with them

7  for 14 years after spending the prior 18 years with the

8  Bernards Township Police Department and he's also been an

9  instructor at Somerset County Police Academy for 30 years.

10       He is a supervisor of the Organized Crime and Narcotics

11  Task Force, and for the past 18 months he's been supervising

12  six detectives and two municipal officers on the task force.

13       Turning to January 8th of 2021, he was also working the

14  4:00 to 12:00 shift.  He was in the area of Somerset and

15  Franklin Township.  He indicated there were three other

16  vehicles looking for suspicious activity.  His vehicle was the

17  only one equipped with lights and sirens.  It was a Chevy

18  Tahoe.  With him in his vehicle were police officers Justin

19  Peleccio and Detective Jamie Guttierez.

20       He indicated that Detective Gambino had notified him,

21  meaning Detective Sergeant Brown, that Detective Gambino was

22  following a BMW and Detective Sergeant Brown was in the area

23  of Davis Street when he first came upon Gambino who was at

24  that time following the BMW.

25       When the vehicles came to the intersection of Frank and

1  Franklin, Detective Sergeant Brown had to wait to cross

2  Franklin due to traffic, and after Detective Sergeant Brown

3  got across the street, he heard Detective Gambino's call for a

4  stop because the BMW had not used a turn signal.

5       At the time Detective Sergeant Brown indicated he could

6  see Detective Gambino's taillights but could not see the BMW.

7  After receiving Detective Gambino's message, Detective

8  Sergeant Brown put on the lights and passed Gambino on Berry

9  Street.  Brown saw the BMW make a left turn on Spruce and was

10 stopped about three-quarters of the way on Spruce on the right

11 side.

12      When Detective Sergeant Brown approached the vehicle,

13 he walked to the front passenger vehicle door -- he did not

14 know the front passenger at the time but later learned that

15 it was Lorenzo Hill -- and he asked Mr. Hill to put his hands

16 on the dashboard.  Detective Sergeant Brown also did not know

17 the other occupants when he first approached.

18      At that point Detective Gambino indicated that everyone

19 had to come out of the BMW with a sense of urgency in his

20 voice.  Detective Gambino indicated that the rear passenger

21 had a handgun.

22      At that point Hill and the driver were also searched as

23 well as the BMW, but, again, nothing illegal was found,

24 nothing of evidential value; and both Mr. Hill and the driver,

25 who turned out to be Miss Hyman, were released and permitted

1  to drive away.

2       Detective Sergeant Brown said later that evening Task

3  Force Officer Pelissier issued the summons.  It was not issued

4  at the scene because, according to Detective Sergeant Brown,

5  they did not have a ticket book.  Normally the Franklin

6  officers are with the task force, but they were not with the

7  task force that night.

8       On cross-examination Detective Sergeant Brown said he

9  did not see the BMW commit any traffic infractions.  He could

10 not see whether the BMW failed to use the turn signal at Berry

11 because he was further behind and had to wait to cross

12 Franklin.

13      He also indicated that he did not have a dash cam

14 because there was no policy for dash cams in unmarked

15 vehicles.  He knows that his task force uses an encrypted

16 channel, but he did not know if the channel was recorded.

17      The defense called Symeerah Hyman.  As of January 8th,

18 2021, she provided background that she was 18 at the time.

19 She was 19 at the time of her testimony.  She lives with her

20 mom.  She attends county college and was also working as a

21 customer service representative.

22      She was dating and appears to still be dating Lorenzo

23 Hill, and on that night, January 8th, she indicated they had

24 been at Hill's house on Stothoff Street, 166 Stothoff Street,

25 in the BMW.  The BMW was parked across the street from

1  Mr. Hill's home.

2      She noted that she was driving and both Mr. Dowdell

3  and Mr. Hill were in the car.  Mr. Hill was in the front

4  passenger's seat and Mr. Dowdell was in the backseat.

5      While she was parked on Stothoff Street, she noticed a

6  white car ride past two or three times which does not appear,

7  at least from my view, to be the detective because the

8  detective was in a black Acura.

9      Also, she had mentioned that earlier the three had gone

10  to a QuikStop, but she could not recall what Hill and Dowdell

11  talked about because she was on the phone and she could also

12  not recall who else was there.

13      While they were on Stothoff Street, Mr. Hill said to go

14  to his friend's house, Troy.  Miss Hyman did not know where

15  Troy lived so instead she relied on Lorenzo's directions.  She

16  now knows that Troy lives at 95 Spruce Street.

17      On the way to Troy's house, she took Millstone Road to

18  Fuller and made a right.  She took that to Blair and made a

19  right.  She noticed a car behind her as did both Mr. Hill and

20  Mr. Dowdell.

21      Hill said to do the speed limit, to make sure that she

22  used her blinkers, and to stop at the stop sign.  She traveled

23  to Berry Street -- this is the critical stop -- and made a

24  right.  She says that she did use her turn signal.  She said

25  she went to Spruce and made a left on Spruce and that as she

1  was turning on Spruce that she noticed the police lights

2  behind her and that she was pulled over.

3      At the stop she said an officer came to Mr. Hill's

4  window and asked for license and registration.  At that point

5  she heard police telling Mr. Dowdell to get out of the car.

6  Police then asked her and Mr. Hill to get out of the car.  She

7  indicates that she was patted down and also made to remove her

8  shoes and the bottom of her feet were rubbed.

9      She was not told at the scene that she had failed to

10 use a turn signal and she was not issued a ticket and no one

11 told her that a ticket would be mailed to her.  However, she

12 did acknowledge that a ticket did come in the mail shortly

13 thereafter.

14     The mail was opened by her mom.  Her mother called her

15 while she was at work and told Miss Hyman about the ticket.

16 Miss Hyman told her mom that she had been stopped but was let

17 off with a warning, which she admitted was not true, during

18 the hearing testimony.  She said the reason she did not tell

19 her mom the truth was because she did not want her mom to know

20 that the car was involved in a car stop and that Mr. Dowdell

21 had been arrested.

22     Her mother told her to pay the ticket and to drive

23 carefully.  The ticket was $85, which Miss Hyman did pay,

24 although she knew she had the right to fight it; but she

25 thought if she tried to fight it, her mother would come to

1   court and find out that she was involved in a stop.

2        On cross-examination Miss Hyman was first asked about

3   her relationship with Hill.  She indicated she had been in a

4   relationship since Thanksgiving of November of 2020.  She knew

5   that he had been released from prison a few months earlier.

6   She knew that he had been in jail for attempted murder.

7        She said that she did not know that he was a member of

8   the gang.  She said she did not know who or what the Bounty

9   Hunter Bloods are.  She was not aware of any recent shootings

10  between the Bounty Hunter Bloods and a rival gang.  She knew

11  that Mr. Hill had the nickname "Hondo Pac," but she was not

12  sure who called him it.

13       As to Mr. Dowdell, she said she met him in December of

14  2020 and she knows that he's called "Pooh" and he's a friend

15  of Mr. Hill's.  She follows Mr. Hill on Instagram.  When

16  looking at Exhibit 7 from Mr. Hill's Instagram account, she

17  first said she did not know what was meant by "free my guys,"

18  but then she acknowledged that it was a reference to free the

19  friends of Mr. Hill in prison but she was not sure if he has

20  several friends in prison.

21       Then in Exhibit 6, which she was shown which showed a

22  number of persons, she said she only recognized Mr. Hill and

23  Mr. Dowdell.

24       As to January 8th, on cross-examination she said her

25  mother knew that she was with Mr. Hill.  She said that

1   Mr. Hill told her to drive correctly because the police were

2   following her and that after Mr. Dowdell was arrested on the

3   way back to Mr. Hill's home she did not speak with Mr. Hill.

4   They did not discuss the fact that Mr. Dowdell had just been

5   arrested or that Hill was on parole.

6        Once they were back to 166 Stothoff Street, Mr. Hill's

7   home, which was around 8:30 or nine o'clock on Friday night,

8   she indicated they did not talk to anyone because everyone was

9   already asleep.

10       As to paying the ticket on cross-examination, she

11  admitted that her mom paid her car insurance and that her

12  insurance went up after she paid the ticket because of the

13  associated points.  She said she was worried about her mom

14  having to pay more and that she paid the ticket on

15  February 8th.

16       So the general law governing this obviously comes under

17  the Fourth Amendment which guarantees the right of a citizen

18  to be free from unreasonable searches and seizures.  The first

19  issue raised is the alleged motor vehicle violation.

20       There's no dispute that if Miss Hyman failed to use her

21  signal the police could stop the vehicle; so it's not a legal

22  dispute, it's a factual dispute, as to whether or not she did

23  in fact use her turn signal.

24       On this point I find that the prosecution has shown

25  that Miss Hyman failed to use her turn signal when making a

1 right onto Berry Street, and therefore the stop was lawful.

2      I find that Detective Gambino credibly testified to the

3 facts of that night.  There was no effort by the detective to

4 gild the lily.  For example, he freely admitted that that was

5 the only motor vehicle violation that he observed.  There was

6 no attempt to say, well, the BMW also crossed double yellow

7 lines or failed to come to a complete stop or some of the

8 other familiar reasons for stopping a vehicle.

9      Now, clearly the detective was suspicious of the

10 vehicle.  It was in an area of increased violence and gang

11 activity.  There had been a recent shooting in the area.  It

12 turned out to be at Mr. Dowdell's house and the car had

13 started in front of Mr. Hill's home, which was consistent with

14 past activity at that area where, according to the detective,

15 they met -- members of the gang met before engaging in

16 unlawful activity.

17      So, yes, the officer was following the vehicle and

18 wanted a reason to stop it, but the subjective intent of the

19 officer is not pertinent.  I also find that Miss Hyman was not

20 credible.  The Government argued that she was being coerced by

21 Mr. Hill into giving testimony.

22      That I don't agree with.  I did not see the evidence of

23 undue coercion.  For example, the Government made the argument

24 that Mr. Hill was present during the hearing in the hallway.

25 In fact, he had an attorney, Mr. Jardines, that I assigned.

1      The reason Mr. Hill was present was because the

2   Government subpoenaed Mr. Hill.  I do not find a valid basis

3   for the Government to subpoena a witness to a hearing and then

4   say the witness is there to provide undue coercion.

5      However, Miss Hyman was in a romantic relationship with

6   Mr. Hill, who is also close with Mr. Dowdell.  According to

7   the Government, Mr. Hill and Mr. Dowdell are literally

8   partners in crime, so there is the inherent bias of the

9   witness.

10     But beyond the potential inherent bias, there were

11  other aspects of Miss Hyman's testimony that did not make

12  sense or were not plausible.  For example, when she said her

13  mother called her about the ticket, she said she told her mom

14  that she was stopped but let go with a warning, and she said

15  that she did not want her mother to know that she was stopped

16  because Mr. Dowdell was arrested.

17     But the mother already knew that Miss Hyman had been

18  stopped because she had a ticket and she admitted to her

19  mother she was stopped, so to say she didn't want her mother

20  to know she was stopped does not make any sense in light of

21  her own admission to her mother and the ticket itself.

22     She also indicates that she lied to her mother that she

23  was let off with a warning.  That seems to indicate, to me,

24  that she was told at the scene she was going to be ticketed.

25  If not, it would not be a lie to say she was let go, whether

1  with a warning or not.

2      If she thought she was lying to her mother when she

3  said: "I was let off with a warning," then it seems to

4  indicate, to me, that she was told at the scene she was also

5  going to be getting a ticket.

6      Now, I understand that she may not be willing to

7  tell her mother the truth out of the fear of learning that

8  Mr. Dowdell got arrested. That's not uncommon, particularly

9  for teenagers, to shade the truth with their parents or not

10 give the parents correct information for fear of reprisals.

11      But beyond that, it also does not make sense that she

12 told her mother she was stopped and let go with a warning but

13 then her mother told her to pay the ticket. Why would her

14 mother tell her to pay the ticket if Miss Hyman's view was she

15 was released with a warning?

16      She also went on to say, Miss Hyman did, that she was

17 worried if she fought the ticket her mother would come to

18 court and find out about the stop. First of all, it's not

19 clear why the mother would go with Miss Hyman. Her mother

20 told her to pay the ticket and the mother already knew about

21 the stop.

22      But, more importantly, in this case, in Federal Court,

23 Miss Hyman gave an affidavit and testified in Federal Court

24 about the stop and Mr. Dowdell being found with a gun. Her

25 mother did not accompany her to Federal Court so her

1 protestations about her mother finding out ring hollow.

2          She also paid the ticket, which certainly reflects that

3 she did commit the traffic infraction despite her testimony

4 that she did not.  It certainly would be easier to fight a

5 municipal court ticket than it would be to come to Federal

6 Court and say:  "I should never have paid the ticket in the

7 first place."

8          And she admitted she got points as a result of the

9 ticket so her insurance had to go up.  So her mom knew that

10 she paid the ticket because her mom paid the insurance.

11          Beyond that, the problems that I had with her

12 credibility, I find that her testimony overall was indicative

13 of admitting solely to what she had to while making other

14 denials and providing testimony that was not plausible.  She

15 indicates that while she knows Mr. Hill was in jail for

16 attempted murder she does not know he is a member of the gang

17 despite postings on his Instagram account.  She does not know

18 who calls Mr. Hill, her boyfriend, "Hondo Pac"; but, more

19 importantly, she says she did not talk with Mr. Hill at all on

20 the way back to his house after Mr. Dowdell had been arrested.

21          She did not talk about Mr. Dowdell's arrest; she did

22 not talk about Mr. Hill being on parole.  That's just not

23 plausible.  At a minimum, you would have expected some

24 discussion about what just occurred.

25          Certainly, it would be reasonable if she questioned her

1  boyfriend how he could put her and the car in jeopardy by

2  letting Mr. Dowdell bring a loaded weapon into the car unless

3  of course she already knew that Mr. Dowdell was carrying a

4  weapon; and, even then, you would expect some type of

5  conversation after Mr. Dowdell was in fact arrested.

6      She also testified that everyone was asleep when they

7  returned to Mr. Hill's home at 8:30 or nine o'clock on a

8  Friday night.  That's not plausible.

9      So, in sum, it appears that Miss Hyman had a

10 conscious effort not to mention any other names or any other

11 conversations that she thought could be potentially harmful to

12 Mr. Hill and Mr. Dowdell while trying to exculpate him, so

13 I do not find her credible.

14     Turning to the second issue, the legality of opening

15 the back door, I want to make clear that the positions of the

16 parties are dispositive to my decision.

17     Mr. Dowdell has argued that the detective impermissibly

18 opened the door after the stop and then saw the bulge.

19 Mr. Dowdell says it was unconstitutional to open the door and

20 of course if the detective had not done so, the detective

21 never would have seen the bulge.

22     The prosecution argues that the motor vehicle stop was

23 proper due to reasonable suspicion, primarily relying on the

24 *Terry* standard as to the legality of opening the door,

25 reciting the well-known *Terry* standard of a reasonable

1  articulable suspicion in light of the totality of the

2  circumstances.

3      The Government's supplemental opposition -- at 9 and

4  page 13 of their opposition, the Government argues that

5  Detective Gambino took into account the reasonableness of his

6  suspicions in light of the totality of the circumstances just

7  as he was trained to do and opened the door of the BMW to

8  speak to Dowdell.

9      I disagree with the Government that the detective had a

10 reasonable articulable suspicion to open the door at that

11 time.  I do give deference to the detective's knowledge and

12 experience.  The detective indicated he was in an area that

13 had seen a surge in gang violence and related criminal

14 activity.

15     He saw the BMW make one traffic infraction while the

16 detective was following it but otherwise complied with the

17 traffic laws and did not engage in suspicious activity.  The

18 detective did not know who was in the vehicle, and when he

19 approached, he indicated he did not report seeing any type of

20 furtive or suspicious activity within the vehicle.

21     Upon reaching the vehicle, he noticed both Mr. Dowdell

22 and Mr. Hill, who he knew both as gang members and he knew

23 that Dowdell's residence was recently targeted by a drive-by

24 shooting.  However, again, the detective did not indicate that

25 before he opened the door he saw any of the occupants engage

1   in any type of furtive or suspicious activity.

2        He did not -- the detective did not indicate that he

3   saw anything indicating that any occupant was engaged in any

4   type of criminal activity or other activity that posed a

5   threat to the detective.  Instead, the detective frankly

6   acknowledged that he opened the door because he wanted to

7   talk to Mr. Dowdell about the recent drive-by shooting at

8   Mr. Dowdell's house.

9        His testimony was very specific on this point.  The

10  detective said that it was his common practice to open the

11  door and to speak with the defendant because the defendant was

12  the victim of a recent gang-related shooting, and the question

13  that was elicited was:  "When you opened the door, what

14  did you see?"

15       The answer was:  "I immediately observed a large bulge

16  in his chest portion of his jacket which was constricted by

17  the seat belt that he was wearing."

18       If I were to accept the Government's position about

19  reasonable articulable suspicion, it would mean that if any

20  officers are in an area of increased gang violence and a car

21  containing gang members committed a traffic infraction, then

22  the officers would have the ability to pat them down.  I have

23  not seen cases extending *Terry* to that degree.

24       For example, the Government relies on the *Headen* case

25  by the 3rd Circuit, which is an unpublished case, but in the

*Headen* case at 264 Federal Appendix 244 the facts were very different.  Because this is a fact-sensitive analysis, I want to review them.

In that case law enforcement had been involved investigating a year-long series of shootings and other violent crimes in southwest and west Philadelphia.  On December 2nd around 6:30, one of the officers received a telephone call from a confidential informant who had previously provided reliable information on the shootings in the area.

The confidential informant said that Headen and another gang member, Thompson, were planning on a retaliatory shooting as an opposing gang member had been shooting at Headen and Headen's friends.  The confidential informant went on to indicate that the two were in a blue minivan, that they were armed, and they were looking for another guy to shoot at.  And also the informant called back and gave a specific location, 42nd and Parrish Streets between 9:00 p.m. and 9:30 p.m.

The officers went to that location at the time.  They did find the blue minivan unattended.  They called the informant, and the informant gave additional information that Headen was returning to the minivan.

While they were waiting, the officers noted that the minivan had an expired registration sticker and also noticed the ultimate defendant come back to the van.  The officers

1 started following the van.  They also noticed that there was a

2 back taillight that was out.

3       At that point they had two bases to stop the car, the

4 expired registration as well as the fact that there was a

5 taillight out.  The officers did further investigation as to

6 whom the van was registered -- it was a person named Rodney

7 Smith -- and the informant confirmed that Smith was an

8 acquaintance of one the suspects, Thompson.

9       When the officers went to stop the vehicle, the minivan

10 took steps to evade the officers.  Ultimately, the officers

11 were able to block the minivan from leaving the area.  As the

12 police removed Thompson from the van and frisked him, they

13 found that he was wearing a ballistic vest.

14       When they took Headen out, during the frisk they felt a

15 large, L-shaped object in the right pocket of Headen's coat.

16 Because of the feel of the object and the informant's tips,

17 they suspected it was a handgun.  At that point they did

18 search the pockets and found a fully loaded handgun.

19       So, ultimately there, looking at the totality of the

20 circumstances among other things, the Court concluded:

21       The officers' personal observations of these evasive

22 actions, combined with their experience in that specific

23 high-crime area, along with the fact that they possessed

24 specific information that Headen might be armed, all suggested

25 that the frisk was warranted.

1        The Third Circuit also noted other factors, as well,

2   but in this case I don't have evasive actions.  I have a

3   failure to use a turn signal and then pulling over once

4   signaled to pull over.  I have the fact that the officers do

5   have their combined experience that they were in a high-crime

6   area and a history of violence; but I also do not have

7   specific information from the officers possessing, in this

8   case the detective, that the vehicle occupants might be armed,

9   so I find *Headen* to be clearly distinguishable.

10       I want to make clear for purposes of review that I do

11  think the Government had an alternate analysis that was

12  available to them, but it was not raised by the Government.

13  It seems, to me, if the Government had raised the alternate

14  analysis, the Government would have prevailed, but I do not

15  think it would be fair to rule on an issue based on an

16  argument not raised by the Government.

17       I found this by doing my own independent research

18  because I was not familiar with the issue as to whether an

19  officer needed reasonable articulable suspicion to open a

20  door.  I conclude that an officer does not necessarily need

21  reasonable articulable suspicion to open the door if the

22  initial stop is legitimate.

23       So, first, there's the *Penn. v. Mimms* case,

24  434 U.S. 106, 1977.  In that case Mimms was driving a war with

25  expired license plates and they stopped him to issue a traffic

1  summons.  The officer approached and asked Mimms to get out of

2  the automobile and to produce license and registration.

3      When Mimms got out, the officer noticed a large bulge

4  under Mimms' sports jacket.  Fearing that there might be a

5  weapon, the officer frisked and found a loaded revolver.

6      The Supreme Court ruled that it was constitutional for

7  law enforcement to order the driver out of the car without any

8  additional objective reason other than the basis for the stop

9  itself.  As to the pat down, the court said that the bulge in

10  the jacket permitted the officer to conclude that Mimms was

11  armed and thus posed a serious and present danger to the

12  safety of the officer.  In these circumstances any man of

13  reasonable caution would likely have conducted the pat down.

14      The question then became, in *Maryland v. Wilson*,

15  519 U.S. 408 -- and I note that the Government cited both of

16  these cases but not for these propositions.  They were on

17  page 10 of the Government's briefs, and the Government just

18  noted officer safety in the context of a *Terry* stop and

19  search.  But the critical points of the cases were not argued

20  by the Government, at least in my view.

21      In *Maryland v. Wilson*, 519 U.S. 408, 1997, the issue

22  was whether the holding of *Mimms* extended to the passengers in

23  the car.  There a car was pulled over for speeding and it

24  lacked a regular license plate.  The driver got out of the

25  car, produced a license, and the officer asked the driver to

1  go back to the car to get the rental agreement.

2       The officer then ordered one of the passengers out of

3  the car.  When the passenger got out, that was Mr. Wilson,

4  crack cocaine fell to the ground and he was arrested and

5  charged with possession with the intent to distribute.

6       In that case the Supreme Court ruled:

7       While there is not the same basis for ordering the

8  passengers out of the car as there is for ordering the driver

9  out, the additional intrusion on the passenger is minimum.

10 We, therefore, hold that an officer making a traffic stop may

11 order passengers to get out of the car pending completion of

12 the stop.

13      They can order passengers out without any additional

14 objective basis other than that which permitted the stop in

15 the first instance.

16       Similarly, *United States vs. Bonner*, Third Circuit

17 case, 2004, 363 F.3d 213, there the Court said:

18       It's uncontested that the initial traffic stop was

19 lawful under the Fourth Amendment.  A police officer who

20 observes a violation of state traffic laws may lawfully stop

21 the car committing the violation, citing to *Mimms*.

22       It was also well settled that the police officer

23 executing such a stop may exercise reasonable superintendence

24 over the car and its passengers.  Under *Mimms* the officer may

25 order the driver out of the vehicle without any particularized

1  suspicion.

2       The Supreme Court extended the bright-line rule to

3  allow the officer to order any passengers out of the car as

4  well.  That's under the *Maryland v. Wilson.*

5       Alternately, the officer may order all the occupants to

6  remain in the car with their hands up.  That's under Third

7  Circuit precedent.

8       In addition, the officer may pat down the occupants of

9  the vehicle and conduct a search of the passenger compartment

10 if he has a reasonable suspicion that the occupants might be

11 armed and dangerous.

12      So before the pat down you still have to meet the *Terry*

13 standard.

14      If the Government had made these arguments, my view

15 would be because the detective could have ordered Mr. Dowdell

16 out of the car, I don't see any other constitutional concerns

17 implicated by the officer merely opening the door.  At most it

18 would be a de minimis intrusion of Mr. Dowdell's rights.

19      The officer could order him out of the car.  Opening

20 the door, to me, does not seem it would have been prohibited.

21 In other words, if the officer can order you out of the car,

22 the officer can also open the door to the car.

23      At most I see that being a de minimis additional

24 intrusion on the passengers' Fourth Amendment rights.  I would

25 have ruled that if he could open the door, then what he saw

1  after he opened the door would have been in plain view, but

2  that was not the argument made by the prosecution in this case

3  so I will not rule on that basis.

4      Again, for the completion of the record, as to the pat

5  down, I did not find that defendant's arguments to be

6  persuasive. *Terry* stop and frisk requires a reasonable

7  articulable suspicion that the person committing or has

8  committed or is about to commit a crime and can also pat down

9  a reasonable suspicion that they are armed and presently

10 dangerous.

11     The defendant argues that I should disregard the fact

12 that the detective testified it was a large bulge shaped like

13 a gun, instead view it as a nondescript bulge in a jacket.  I

14 am not quite sure what defense means by a nondescript bulge in

15 a jacket.  A bulge in a jacket is a bulge in a jacket.

16     Under the Supreme Court precedent, that was all that

17 was necessary, the bulge itself, to conduct a *Terry* pat down

18 and search.  But at that point I would also add there were

19 other reasons to conduct the pat down besides the bulge in the

20 jacket.  That would have been because at that point the

21 officer knew he was in a general area of increased violent

22 crime, the specific street he was on, increased narcotics

23 complaints and firearms arrests, the defendant's residence had

24 recently been subject to a drive-by shooting, the defendant

25 was a known gang member, and there was a bulge in his jacket.

1   In my view, that would have certainly been a reasonable

2   articulable suspicion.

3         But, ultimately, I will grant the motion to suppress

4   because I do not find the Government's argument that there was

5   a reasonable articulable suspicion to open the car door to be

6   valid.  On that ground I will grant the motion to suppress,

7   and I will enter an order consistent with my decision.

8         MR. FRAZER:  Judge, may I just have an opportunity to

9   clarify one point --

10        THE COURT:  Sure.

11        MR. FRAZER:  -- because obviously this will be

12  reviewed.  And while we respect Your Honor's decision, it will

13  be reviewed.

14        So Your Honor's take is that even though the Government

15  cited *Maryland vs. Wilson* which stands, as Your Honor said,

16  for the proposition that after -- if I'm reading it correctly,

17  after a legitimate traffic stop, which the Court has found,

18  right, that she failed to signal, that the officers have a

19  right to ask even passengers -- because it's a de minimis

20  infringement of their Fourth Amendment rights -- to come

21  out of the car; but because the Government did not state that,

22  cited the holding in *Maryland vs. Wilson* for a different

23  reason --

24        THE COURT:  No.  You didn't cite the holding.  That's

25  the problem.  Let me make it clear --

1          MR. FRAZER:  I'm sorry.  Yes, Judge.

2          THE COURT:  I think, this is where, Mr. Frazer, with

3    all due respect you try to massage what's already been

4    submitted.  That's why I clarified with Ms. Randolph at the

5    beginning:  "Is your argument that this is reasonable

6    articulable suspicion?"

7          And I made that clear on the record.

8          MR. FRAZER:  Right.

9          THE COURT:  This is what you argued:  You said that

10   the Supreme Court has routinely -- this is when you cited

11   *Maryland v. Wilson*.  You said that the Supreme Court has

12   routinely recognized that traffic stops pose substantial

13   risks to the police who perform them and has extended the

14   constitutional principles in *Terry* to such encounters.

15         You never said a separate argument that we can get

16   them -- it was a *Terry* argument and that's why I wanted to

17   make sure it was a *Terry* argument.  That's on page 10 of your

18   brief.

19         So to say "we cited it" and now you're saying -- no,

20   you didn't cite it for the proposition that I cited it for.  I

21   had to go find that through independent research.

22         MR. FRAZER:  I understand that, Judge.  I'm not

23   disputing that.  What I'm asking is is that the Court agrees

24   that *Maryland vs. Wilson* would allow, after a proper traffic

25   stop, a police officer to order out not only the driver who

1  committed the stop but the passenger?  Right?

2      That's what Your Honor said, I believe, after doing

3  your own research into *Maryland vs. Wilson.*

4      THE COURT:  I think it's clear that the officer could

5  have ordered them out.  What I also did by my own independent

6  research is because New Jersey has a different standard --

7      MR. FRAZER:  Right.

8      THE COURT:  New Jersey has a higher standard to order

9  passengers out, but the New Jersey Supreme Court says once you

10 order a passenger out you can open the door, as well, but that

11 was not cited.

12     MR. FRAZER:  Okay, but I just want to make that clear

13 for the record, too.  Under New Jersey law they could have

14 asked the passengers out after opening the door, and our

15 argument, just for the record, Judge, is that even though he

16 saw the bulge and immediately told his fellow officers, you

17 know, basically "We have to take them all out.  Gun" --

18 Your Honor is saying the fact that he saw that bulge after a

19 legitimate traffic stop and never got to order them out did

20 not factor into your decision.  Right?

21     He could have at that point -- under both New Jersey

22 law and Federal law under *Maryland vs. Wilson*, the officer had

23 a legitimate right to order them out, and Your Honor's

24 position -- I just want to make clear -- is because the

25 Government did not argue that, therefore, Your Honor is not

1   going sua sponte to make that ruling.

2         I'm just trying to understand, for basis of appeal.

3            THE COURT:  Right.  Correct.

4            MR. FRAZER:  That's fine, Judge.  I just want to

5   clarify that.

6            THE COURT:  Let me make it clear again.  I think you

7   had a legitimate basis to win this case.  I would have found

8   that once you can order somebody out of the car you also have

9   the right to open the car door.  I don't think you need a

10  reasonable articulable suspicion.

11        But Mr. Sharma didn't get the benefit of that argument

12  so I could hear him reply.  That's why I'm only saying I think

13  that's the way I would have ruled because he didn't have the

14  opportunity to reply.  To the contrary, his position was you

15  waived that argument because you didn't argue against my view

16  in his reply brief.

17        Let's make the record clear.  Defendant's position was

18  you waived it because you didn't raise it.  So I think it

19  would be fair to say you have waived that argument because you

20  didn't raise it.  I'm also making a separate finding that even

21  though I think I could have found that it was constitutional,

22  that argument has been waived by the United States by their

23  failure to raise it.

24           MR. FRAZER:  Okay.  My only point I want to raise for

25  the record if this is reviewed is factually speaking, not

1 | legally speaking, it never got to that point.  In other words,
2 | he saw the bulge when he opened the door, which he had a right
3 | to do to tell them -- under both New Jersey and Federal law he
4 | had the right to open the door to say --
5 |        THE COURT:  You should have argued that to me,
6 | Mr. Frazer.
7 |        MR. FRAZER:  I understand.
8 |        THE COURT:  I am finding that the United States has
9 | waived that argument because they did not raise it in the
10 | brief.  Okay?
11 |        MR. FRAZER:  Understood.
12 |        THE COURT:  I know you're going to go up and say:
13 | Well, we cited the case.
14 |        You didn't cite it for that proposition.  I think it's
15 | important, as well -- Mr. Sharma pointed this out, let me just
16 | pull it up, because when I read your brief I said why haven't
17 | they addressed the opening of the car?  I have not dealt with
18 | that before.
19 |        In the reply brief Mr. Sharma jumped on that omission
20 | and basically said:  They have not challenged my argument as
21 | to the ability to open the door and that's now waived.
22 |        MR. FRAZER:  Okay.  Understood.
23 |        THE COURT:  I also find there's been a waiver.
24 |        MR. FRAZER:  I'm just saying that factually -- in the
25 | Government's opinion, respectfully, Judge, factually we never

1  got to that point so I'm making that argument.

2       THE COURT:  How can you not get to that point when

3  Mr. Sharma raised it directly in his supplemental brief?

4       MR. FRAZER:  I'm not talking legally, Judge.  Based

5  on the facts, as the testimony said, he opened the door,

6  right, which he had a right to do under New Jersey and Federal

7  law, and at that point --

8       THE COURT:  No, stop.  He did not have a right to do

9  it under New Jersey law.  Under New Jersey law you need more

10 than just to order the passengers out, but what the New Jersey

11 Supreme Court has said is that once you have the right to

12 order them out it also includes the right to open the door.

13      MR. FRAZER:  That's all I'm saying.

14      THE COURT:  I was going to follow that as persuasive

15 and say if you do have the right to order somebody out of the

16 car it also encompasses the right to bring them in.  I don't

17 know how you're saying that we never got to that when this was

18 Mr. Sharma's point, too, in his brief.

19      What do you mean we didn't get to it?

20      MR. FRAZER:  In other words, he opened the door

21 legally -- I don't think there's a dispute about that -- and

22 then he didn't get to the point of ordering them out because

23 instead he yelled to his -- he saw the bulge, so he --

24      THE COURT:  He may have opened the door legally, but

25 that's not what you argued.  You argued he had a reasonable

1  articulable suspicion to open the door, and I don't find

2  that's supported.

3     MR. FRAZER:  Again, our position simply is,

4  regardless of what that argument was, he had the right to open

5  the door and order the passenger out both under State law and

6  Federal law and we believe -- and respectfully I understand

7  completely Your Honor's argument that the Government failed to

8  raise that issue or combat that issue and we waive it, but

9  just for the record, Judge, I'm making the point that we

10  believe factually we never got to that point that we had to

11  argue that or had to respond because it just factually wasn't

12  relevant because he opened the door legally and there was no

13  point -- he ordered him out because he saw the criminal

14  activity itself.  So that's our point.

15     THE COURT:  I'll say for the record, Mr. Frazer, that

16  your point is completely belied by your brief because you

17  argued the legality of opening the door in the brief.  To now

18  say it's irrelevant, I don't know how you can argue to me now

19  that it's irrelevant when Mr. Sharma raised it in his brief,

20  you responded to it in your opposition, and then he put it in

21  the reply and now you're saying it doesn't matter.

22     My view is this:  I'm not happy about this decision.

23     MR. FRAZER:  I understand.

24     THE COURT:  I am not happy, but I think it's what I

25  am constrained to do under the facts.  But --

1      MR. FRAZER:  We respect Your Honor's decision.

2      THE COURT:  -- my view as a Judge is I let the

3  parties argue, but what I don't want to have happen -- I know

4  there's going to be an appeal.  If the Circuit agrees with me,

5  fine.  If they don't, they don't.  That's fine.

6      But what I don't want to happen is -- to the Circuit:

7  "We cited the case, the Judge found it" but that's not what --

8  you cited a reasoning for the ultimately holding in that case

9  but the holding was different than what was cited.

10      I had never heard this argument before, what do you

11  need to open a door?  I understand what you're saying, but I'm

12  just a little bit miffed because I had to do the research to

13  find that answer that you're now saying is the right answer

14  like, "Judge, it's obvious."  Well, you should have argued it,

15  then.

16      MR. FRAZER:  I understand Your Honor's position.

17  Again, no disrespect to the Court.  I'm just making the record

18  since clearly, as you said, it may be reviewed.  That's all.

19      THE COURT:  I anticipate you're going to review.

20  That's why I wanted to make clear what I did independently.

21      MR. FRAZER:  I'm just doing my job, Judge, to put

22  that on the record --

23      THE COURT:  Look, I let you make your record and I'll

24  give you my views.

25      MR. FRAZER:  I appreciate it.

```
 1          THE COURT:  I'll enter the order.  Tell me if you're
 2   going to appeal it because obviously that will go to release,
 3   and then if you want time to take it on an immediate appeal --
 4   let me get the order and then let me know what you're going
 5   to do.
 6          MR. FRAZER:  Judge, we will do that.  Obviously we
 7   understand the defendant is incarcerated.  We will quickly
 8   speak to our appellate folks and try to get Your Honor a
 9   decision very quickly because we understand the situation.
10          Judge, again, I have to object for the record to
11   Your Honor's decision and opinion.
12          THE COURT:  I'm responding on the merits to your
13   argument.  I have no problem that you're doing it.  I
14   understand you have to protect it.  This is not personal
15   at all.  I'm responding to the merits and the way I looked
16   at it.
17          MR. FRAZER:  The record is made.  Thank you,
18   Your Honor.  We appreciate the opportunity.
19          THE COURT:  Thank you.
20             (Which were all the proceedings had in
21              the foregoing matter on said day.)
22                        *         *         *
23
24
25
```

1          FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

2

3      I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4  Reporter of the United States District Court for the District

5  of New Jersey, do hereby certify that the foregoing

6  proceedings are a true and accurate transcript of the

7  testimony as taken stenographically by and before me at the

8  time, place, and on the date hereinbefore set forth.

9      I further certify that I am neither related to any of the

10 parties by blood or marriage, nor do I have any interest in

11 the outcome of the above matter.

12

13

14

15          */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

16          Official U.S. District Court Reporter ~

17

18          DATED this December 3, 2021

19

20

21

22

23

24

25